# IN THE SUPREME COURT OF IOWA

No. 22–1581

Submitted January 23, 2024—Filed February 16, 2024

**STATE OF IOWA,**

    Appellee,

vs.

**PAULA LYNN COLE,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, William Patrick Wegman, District Associate Judge.

Paula Cole seeks further review from the court of appeals opinion affirming her conviction of child endangerment. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR DISMISSAL.**

May, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Ella M. Newell (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

**MAY, Justice.**

A parent commits child endangerment under Iowa Code section 726.6(1)(*a*) (2021) when the parent "[k]nowingly acts in a manner that *creates* a substantial risk to a child or minor's physical, mental or emotional health or safety." (Emphasis added.) Here we consider whether a mother of six children "create[d]" such a risk by leaving her oldest five children, whose ages ranged from twelve to five, asleep in their home while the mother went to Walmart for groceries. *Id.* Under the facts presented, we do not believe that the mother *created* a risk that violated section 726.6(1)(*a*). Accordingly, we reverse the mother's conviction of child endangerment.

## I. Factual and Procedural Background.

In 2021, Paula Cole lived in an apartment at 1009 South Hackett Road in Waterloo. Paula's apartment was part of a complex of apartments in a secured building. You need a key or a card to get into the building.

Cole lived with her six children. She had four boys and two girls. The oldest boy was twelve. The second oldest boy was ten. The oldest girl was nine. There were two younger boys, ages seven and five. The youngest girl was an infant.

On the morning of July 2, 2021, Cole decided to drive to Walmart to get diapers, toilet paper, and groceries. She took her infant girl with her. She left around 11 a.m. The evidence is mixed as to whether Cole woke up any of the children before leaving. The jury could have found that she left them sleeping in the apartment.

While Cole was gone, a controversy arose among the children. The nine-year-old girl, C.C., had a disagreement with one of the younger boys. The disagreement was about leftover food. C.C. threatened to "put hands" on the younger boy, but then the ten-year-old boy, Q.C., intervened. C.C. backed off but decided to leave the apartment building.

Q.C. was upset about C.C. leaving the building. So Q.C. went to an adult, Johnathan Wheeler, for help. Wheeler was one of Paula's neighbors. He and his wife lived in the same apartment complex. Wheeler had not spoken to Cole about her Walmart trip on July 2. And there was no specific agreement for Wheeler to watch the children or even to stay home. But Wheeler testified that he and his wife had "a prior agreement" with Cole about the children. Wheeler explained: "We've had an open door policy. We had a prior agreement with that. Any time her kids needed us, they would just come over. That's how it was."

On the morning of July 2, Q.C. told Wheeler that C.C. had gone outside and that Q.C. wanted her to come back into the building. So Wheeler went outside with Q.C. and tried to coax C.C. back in. C.C. refused. As Wheeler explained it, C.C. "was just outside being angry, stomping around, pacing back and forth and stuff, but that's -- and wasn't listening to what we were telling her. That's what happened."

Wheeler then let Q.C. use his phone to call 911. During the 911 call, Q.C. said the problem was that C.C. had gone outside and was "standing in front of the door." Wheeler also participated in the call. Wheeler provided dispatch with the apartment address and number as well as his cell phone number. Wheeler told dispatch that he was almost thirty-two years old, that he was a neighbor, and that he "help[s] the kids out when they need it." Wheeler confirmed that he was "there to help with the kids." Wheeler also helped describe C.C. and her attire: white shirt, blue sweats, and barefoot. Wheeler also confirmed that C.C. was "right outside the building."

At trial, Wheeler testified that C.C. did go into the parking lot and, at some point, appeared to be "heading off the property." But Wheeler also testified that C.C. "didn't do a lot of walking out in the parking lot" before "she came back to the front stoop area."

Wheeler also testified that he hadn't "thought the kids were in such danger that [he] thought 911 was needed." But, Wheeler explained, Q.C. was "a little concerned" and "kind of freaking out a little bit." So Wheeler let Q.C. use the phone "mainly just to help him calm down."

The 911 dispatch sent Officer Shawn Bram to the apartment complex. In his testimony, Bram said that dispatch had told him that "a child had called in reporting that their sibling had run away." But the 911 recording does not include any reference to any child running away. Rather, as noted, Wheeler told the dispatcher that C.C. was "right outside the building."

When Bram arrived at the apartment building, he was greeted by several of the children. Bram testified that, in his conversation with these children, he was told that C.C. had said "she was going to run away," and that Q.C. "was worried for his sister's safety." But Bram also testified that, when he arrived, C.C. was with the other kids who greeted him in front of the building. "She never actually took off and ran away that I'm aware of," Bram confirmed. Bram also confirmed that:

- None of the children had actually run away.
- No child was lost.
- No child was crying.
- No child was bleeding.
- No one was hurt at all.

The children let Bram into the apartment. Bram found that the twelve-year-old boy was either sleeping or pretending to sleep.

Meanwhile, dispatch contacted Cole. Cole arrived back at the apartment about twenty minutes after dispatch called her. She was carrying the infant and bags from Walmart when she came into the apartment.

The State charged Cole with child endangerment. Cole pleaded not guilty, and the case proceeded to trial. A jury found Cole guilty. Cole appealed her conviction. The court of appeals affirmed. Cole sought further review. We granted Cole's request.

**II. Merits.**

On further review, Cole challenges the sufficiency of the evidence supporting the jury's verdict that she was guilty of child endangerment. We review sufficiency-of-evidence challenges for errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). If substantial evidence supports the jury's verdict, we will uphold it. *Id.* "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). "Evidence raising only 'suspicion, speculation, or conjecture is not substantial.' " *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017) (quoting *State v. Leckington*, 713 N.W.2d 218, 221 (Iowa 2006)).

The district court instructed the jury that Cole could be found guilty of child endangerment only if Cole "knowingly acted in a manner that created a substantial risk to the children's physical, mental or emotional health." The court's instructions defined "substantial risk" as "the very real possibility of danger to a child's physical, mental or emotional health or saf[e]ty." These instructions are consistent with section 726.6(1)(*a*) and our cases interpreting the statute. *See* Iowa Code § 726.6(1)(*a*) (providing that a parent with custody over a child commits child endangerment if the parent "[k]nowingly acts in a manner that creates a substantial risk to a child or minor's physical, mental or emotional health or safety"); *State v. Anspach*, 627 N.W.2d 227, 233 (Iowa 2001) (en banc) (interpreting "substantial risk" to mean "[t]he very real possibility of danger").

Notably, the jury instructions and the statute required the State to prove that Cole "created" the substantial risk at issue. And, of course, not all risks that children encounter are "created" by their parents or other caregivers. Life is inherently risky. None of us can escape all risks. And no parent can shield a child from all risks. Rather, parents' best hope is simply to *manage* life's risks— including the very real risk that our efforts to avoid one risk will end up creating new and different risks. *See, e.g.,* David Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?*, 2012 Utah L. Rev. 947, 961 [hereinafter Pimentel]; *see also State v. Chavez,* 211 P.3d 891, 897 (N.M. 2009) ("[V]irtually any conduct directed toward a child has the possibility, however slim, of endangering the child's life or health." (quoting *People v. Hoehl,* 568 P.2d 484, 486 (Colo. 1977) (en banc))). Here are some examples from an article written by law professor David Pimentel:

- "Protecting a child from the risks associated with playing on climbing equipment (from which they could fall) exposes them to the risks associated with a lack of physical exercise."

- "Protecting them from the risks associated with playing freely in the neighborhood by ensuring that they are continually under adult supervision exposes them to the risk of growing up with a sense of dependency and helplessness."

- "Even vaccines, which are supposed to protect children from serious disease, carry a measurable risk of death."

Pimentel, 2012 Utah L. Rev. at 961–62.

Indeed, even high school football—a beloved tradition in Iowa—presents a risk-management dilemma. *See id.* at 962. Allowing a child to participate will expose the child to the risk of serious injuries, including concussions. *Id.* And yet, while "[r]efusing a child's request to play high school football may lower risk

of injury, . . . it increases (1) health risks associated with lack of physical exercise, (2) risks of delinquency if the youth is bored and available to get into trouble in the afternoons, and (3) the risk of social alienation—which may be significant with respect to his emotional health—because he is not part of the team and is denied the social status that high school communities bestow upon student athletes." *Id.*

As these examples suggest, navigating life's endless stream of risks can be challenging for parents. *See id.* at 961–62. The challenge can be complicated by the limited availability of information and, in some cases, the spread of misinformation. For instance, media accounts often emphasize the risk of stranger abductions. *Id.* at 963–66. Those reports might seem to counsel in favor of driving our children to school rather than letting them walk or ride bikes. Yet, as Pimentel notes, the statistical risk of stranger abduction is effectively "nonexistent." *Id.* at 959.

> People are struck by lightning more than three times as often as children are abducted by strangers. According to the statistics cited by the National Center for Missing and Exploited Children, only about 1 in 1.5 million children will be abducted and killed this year. In an effort to put these odds in perspective, one commentator has observed that, statistically, someone who wanted a child to be abducted would have to leave the child outside, unattended, for 500,000 years before he could expect it to happen.

*Id.* at 960 (footnotes omitted).

Conversely, automobile injuries and deaths are literally everyday occurrences. "Indeed, the American Academy of Pediatrics has published statistics suggesting that 'being driven to school in a passenger vehicle is by far the most dangerous way to get there.'" *Id.* at 959 (quoting Jane E. Brody, *Turning the Ride to School into a Walk*, N.Y. Times, Sept. 11, 2007, at F7).

In light of the many risks that confront families in the course of ordinary life, as well as the inherent difficulty for parents in trying to balance those risks, courts must exercise special caution when deciding whether a parent has "create[d]" a particular risk and, therefore, may be subject to criminal liability under section 726.6(1)(*a*). Iowa Code § 726.6(1)(*a*). To "create" means to "make something, . . . [to] bring something into existence." *Create*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/thesaurus/create [https://perma.cc/E6CH-B5PK]. A parent does not *create* a risk if that risk is part of the background risk of ordinary life. Rather, a risk is created by a parent when the parent's behavior produces an identifiable risk that falls outside the range of risks that accompany ordinary life. Ordinarily, this means that a parent creates a risk when that risk is the product of behavior that is (1) *independently* unlawful, that is, unlawful under a statute other than section 726.6; or (2) overtly abusive. Behaviors of these kinds are usually present in convictions upheld by our court and the court of appeals. Here are several examples:

- In *State v. Folkers*, the defendant caused a fire in the family home by smoking illegal drugs with an oversized butane torch. 941 N.W.2d 337, 338–40 (Iowa 2020).

- In *State v. Benson*, the defendant caused severe bruises by hitting three children with a broomstick. 919 N.W.2d 237, 240, 242–43 (Iowa 2018) (finding sufficient evidence to support endangerment conviction but reversing based on erroneous jury instruction).

- *State v. Schlitter* involved physical abuse that led to the death of a two-year-old. 881 N.W.2d 380, 390 (Iowa 2016), *overruled in part on other grounds by Crawford*, 972 N.W.2d 189. The defendant either "was the abuser" or knowingly endangered the child by leaving the child in the sole care of the abuser. *Id.*

- In *State v. Anspach*, the defendant had driven his truck "nearly twenty miles an hour over the [speed] limit" and "tried to outrun police" with "four small children"—ages "one, two, two, and three"—in the truck cab. 627 N.W.2d at 230, 233.

- In *State v. Castillo Fuentes*, the defendant sexually molested a child, and then—when the child tried to stay away from him—he "hurt" the child and "left a mark on her arm" by " 'grabb[ing]' her arm 'really hard' and physically pull[ing] her 'to the other side of the bed.' " No. 22–0099, 2023 WL 3613287, at *2 (Iowa Ct. App. May 24, 2023).

- In *State v. Dean*, the defendant hit a three-year-old child multiple times. No. 21–1338, 2023 WL 1810033, at *3–4, *8 (Iowa Ct. App. Feb. 8, 2023).

- In *State v. Tewes*, the defendant pulled on a six-year-old's arm so hard that the child told people "his dad had tried to rip his arm off," and then also shoved the child's mother while the defendant was holding the child. No. 20–0990, 2021 WL 4304240, at *1–3 (Iowa Ct. App. Sept. 22, 2021).

- In *State v. Taylor*, the defendant used illegal drugs "frequently" in the home of six children, sexually abused the oldest child, and also "regularly hit" the children's mother "and the children." No. 20–1062, 2021 WL 3894185, at *3–4 (Iowa Ct. App. Sept. 1, 2021).

- In *State v. Williams*, the defendant "repeatedly struck" a four-year-old child "with enough force that it left bruises covering" the child's body "and caused hemorrhaging of several internal organs." No. 19–0152, 2020 WL 4497993, at *3–4, *7 (Iowa Ct. App. Aug. 5, 2020).

- In *State v. Davis*, the defendant was holding an eighteen-month-old child when he hit another man with a loaded handgun and then

discharged the gun into the ceiling while the gun was "near the child's head." No. 18–1487, 2020 WL 1310271, at *1–2, *4 (Iowa Ct. App. Mar. 18, 2020).

- In *State v. Fiems*, a defendant "lock[ed] his almost-seven-year-old child in a bare basement room for ten to twelve hours a night without access to a bathroom, communication, or egress." No. 18–2186, 2019 WL 5428860, at *1 (Iowa Ct. App. Oct. 23, 2019).

- In *State v. Ackiss*, an angry defendant punched through the window of a minivan. No. 18–1787, 2019 WL 4678184, at *1 (Iowa Ct. App. Sept. 25, 2019). Two children were sitting inside the van. *Id.* Both children were injured by shattered glass. *Id.* at *1–2.

- In *State v. Ingram*, the defendant pointed a shotgun at the child's mother and threatened to shoot her, while in the child's presence. No. 17–0584, 2018 WL 1870417, at *1, *6 (Iowa Ct. App. Apr. 18, 2018).

- In *State v. Winder*, the defendant caused visible injuries to a fifteen-month-old child by hitting the child on the head. No. 17–0232, 2018 WL 1182619, at *1, *3–4 (Iowa Ct. App. Mar. 7, 2018).

- In *State v. Rollins*, the defendant was "mad" and "yelling" when he "brandish[ed] a knife in close proximity to a child's face." No. 12–0548, 2013 WL 988853, at *1, *5–6 (Iowa Ct. App. Mar. 13, 2013).

- In *State v. Watkins*, the defendant used methamphetamine in the presence of a two-year-old child. No. 01–0139, 2002 WL 1427560, at *1, *8 (Iowa Ct. App. July 3, 2002) (per curiam).

Ordinarily, then, parent-*created* risks are those risks that arise from parents' illegal or overtly abusive behavior. *See, e.g.*, *Schlitter*, 881 N.W.2d at 390; *Anspach*, 627 N.W.2d at 230–33. Even so, there can be occasions when parents create risks through behavior that is neither independently unlawful nor

overtly abusive. In those cases, though, we still expect the record to show that the parent's behavior created an identifiable risk that fell clearly outside the risks of ordinary life.

*State v. Millsap* is a good example. 704 N.W.2d 426 (Iowa 2005). *Millsap* arose from a tragic accident in which two boys, ages nine and ten, fell from the bed of a truck that the defendant was driving. *Id.* at 429. The bed had been full of brush. *Id.* The children had been sitting on top of the brush. *Id.* The defendant drove the truck through Des Moines. *Id.* The wind picked up the brush. *Id.* The brush and the children were deposited on the street. *Id.* The children suffered fatal head injuries. *Id.* The defendant was convicted of child endangerment. *Id.*

On appeal, the defendant argued essentially that although the accident was tragic, it was a product of life's ordinary risks. *Id.* at 430–31. After all, the defendant noted, "children have long ridden in the back of pickup trucks." *Id.* at 431. Our court rejected this argument. *Id.* We concluded that the defendant had created a situation "more egregious than children simply riding in the back of a pickup." *Id.* Although "[t]he bed of the defendant's truck was equipped with side panels," we noted that

> [it] only had a wooden plank across the end that provided little protection against persons or branches falling or being blown out the back of the truck. Moreover, the children were young, and the defendant had placed them amidst improperly loaded tree limbs that had not been secured to the truck bed. It was easily foreseeable that the branches might be blown off the truck, taking the children with them.

*Id.*

Thus *Millsap* distinguished between *ordinarily* risky situations, like that of children "simply riding in the back of a pickup" truck, and the *extraordinary* risk that a caregiver created by placing children "amidst improperly loaded tree

limbs" in a truck bed that lacked a proper tailgate. *Id.* It is this latter sort of risk—extraordinary risk—that can expose defendants to liability.

In summary, for purposes of Iowa Code section 726.6(1)(*a*), a parent creates a risk when that risk is clearly outside the range of risks that accompany ordinary life. This requirement is satisfied when the risk results from (1) a parent's independently unlawful behavior, (2) a parent's overtly abusive behavior, or (3) other parent behavior that creates an identifiable risk that falls clearly outside the risks of ordinary life.

Applying these principles here, we conclude that Cole's behavior did not fit into any of these three categories. To begin with, the State does not contend that Cole's actions were independently unlawful. No Iowa statute prohibited Cole from leaving her five oldest children alone while she took the youngest to Walmart. Indeed, no Iowa statute sets a minimum age at which children can be left home alone. Officer Bram confirmed that this is true.

Similarly, no evidence suggests that Cole was overtly abusive toward her children. She did not hit them or otherwise harm them. And no child was harmed while Cole was absent. Officer Bram verified that no child was hurt or even crying.

Finally, we see no evidence that Cole otherwise "create[d]" an identifiable risk that fell outside the range of risks that accompany ordinary life. *Id.* Cole left to get groceries and diapers while her oldest children, ages five through twelve, slept in their home. No evidence suggests that this strategy created any extraordinary risk. Indeed, no evidence shows that leaving the kids home was any riskier than driving them to Walmart (even assuming she had a vehicle that big).

The State points to evidence that:

- the twelve-year-old male child was asleep or otherwise inattentive;

- the ten-year-old boy, Q.C., was autistic—although the record is vague as to how this impacts Q.C.;

- the nine-year-old girl, C.C., was experiencing puberty-related difficulties in regulating her emotions;

- conflict among these children was foreseeable;

- actual conflict occurred—although no one was hurt;

- actual conflict led C.C. to leave the building, enter the parking lot, and, at one point, "head" off of the property while barefoot;

- during her journey, it was possible that C.C. would encounter streets, intersections, and strangers—although the record does not describe any streets, intersections, or strangers;

- it was possible that the neighbors would not have been home and available to help;

- it was possible that the kids would be unable to reach Cole immediately in an emergency; and

- even if a child reached Cole, Walmart was roughly twenty minutes away and, therefore, Cole couldn't react immediately.

Viewing these facts in the light most favorable to the verdict, as we must, we cannot say that Cole created any identifiable risk that was outside the risks of ordinary life. Of course, because life is inherently risky, Cole's children encountered risks while she was away. But we don't think those risks were *created* by Cole's decision to go to Walmart while her children slept in their apparently safe apartment in a secured building in which a helpful neighbor resided. Rather, they were ordinary risks of everyday life. For instance, the State emphasizes C.C.'s departure from the building, her entry into the parking lot,

and her possible journey into the surrounding area off of the apartment property. Yet there is no evidence that those travels exposed C.C. to *extraordinary* risk of harm. For example, there was no evidence that any dangerous animal or human roamed in Cole's neighborhood. Nor was there evidence that C.C. was unable to self-protect by avoiding automobiles in the same way that pedestrians—including nine-year-old children—traditionally have. Nine-year-olds have long been trusted to walk to school without adult supervision. Am. Acad. of Pediatrics, *Back-to-School Tips for Families* (Aug. 23, 2023), https://www.healthychildren.org/English/ages-stages/gradeschool/school/Pages/Back-to-School-Tips.aspx [https://perma.cc/6E93-KZAS] ("Children are generally ready to start walking to school at 9 to 11 years of age.").

In the State's view, though, Cole's conviction is supported by the court of appeals' unpublished opinion in *State v. Swift.* No. 22–0231, 2023 WL 2674091 (Iowa Ct. App. Mar. 29, 2023). We disagree. The parent in *Swift* deposited a six-year-old boy on his own in a busy parking lot near a busy intersection at dusk in December while the boy was wearing only "shorts, a t-shirt, and no coat." *Id.* at *1. Conversely, Cole left her children in the children's home—and no evidence suggests that the home was unsafe. *See id.* at *2 (distinguishing an Ohio case where a "father left his son unattended in the safety of his own home for a short time"). Some of Cole's children were old enough to help supervise the others. The ten-year-old boy, Q.C., actively worked to supervise the others. A neighbor was also willing to help the children. While the children could have gone outside, as C.C. did, it was the middle of the day on July 2. And, as explained, there is no evidence of any special risks outside of the building. In short, the situation here was very different from that in *Swift. See id.*

As the State points out, though, there was evidence that—at least after law enforcement got involved—Cole regretted her choice to leave the children without

an adult. For one thing, there was evidence that Cole initially lied to Bram about what arrangements she had made for the children. Although Cole initially claimed that the children's father was coming to the building as she left, Cole later conceded that he was not. Later, when a department of human services child protection worker interviewed Cole in jail, Cole conceded that it was "not appropriate" to leave the children without an adult. We agree with the State that, when viewed in the light most favorable to the verdict, these concessions were evidence of Cole's guilty mindset. And so, as the State argues, Cole's concessions provide evidence to fulfill section 726.6(1)(*a*)'s subjective requirement, that is, its requirement that the defendant act "[k]nowingly." Iowa Code § 726.6(1)(*a*). Even so, section 726.6(1)(*a*) also has objective requirements. *Id.* Specifically, section 726.6(1)(*a*) is not violated unless the parent's actions have created a substantial risk to the children. *Id.* And here, the evidence does not show that Cole's actions created such a risk.

A final note: we do not suggest that it is always appropriate or lawful for parents or other caregivers to leave children without adult supervision. In some situations, leaving children without adult supervision could create a substantial risk in violation of section 726.6(1)(*a*) or other provisions. *See, e.g., State v. Leckington*, 713 N.W.2d 208, 214 (Iowa 2006) (affirming conviction under 726.6(1)(*a*) where the defendant left a severely intoxicated teenager who had fallen and hit his head "at her home without further adult supervision"); *see also* Iowa Code § 726.6(1)(*d*) (prohibiting parents from "[w]illfully depriv[ing] a child or minor of necessary food, clothing, shelter, health care or supervision appropriate to the child or minor's age, when the [parent] is reasonably able to make the necessary provisions and which deprivation substantially harms the child or minor's physical, mental or emotional health"), (*f*) (prohibiting parents from "[a]bandon[ing] the child or minor to fend for the child or minor's self,

knowing that the child or minor is unable to do so"). But the record here does not present a situation of that kind.

### III. Disposition.

The evidence does not support a finding that Cole "[k]nowingly act[ed] in a manner that *create[d]* a substantial risk to a child or minor's physical, mental or emotional health or safety" as prohibited by Iowa Code section 726.6(1)(*a*) (emphasis added). Accordingly, we must reverse Cole's conviction and remand for dismissal.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR DISMISSAL.**